Argued and submitted May 11, remanded in part with instructions; otherwise affirmed December 23, 1992, reconsideration denied March 24, petition for review denied May 25, 1993 (316 Or 528)

In the Matter of the Estate of
Anna E. Holst, aka Effie Holst, Deceased.

Leland HOLST,
Personal Representative
of the Estate of Anna E. Holst,
Trustee of the Testamentary Trust
Established Under the Will of Anna E. Holst Estate,
and Trustee of the Intervivos Trust
Established by Anna E. Holst as the Settlor,
*Respondent,*

*v.*

Dwight G. PURDY,
Conservator for Aubrey Ray Holst,
*Appellant.*

(50-87-09480; CA A65350)

844 P2d 229

G. David Jewett, Springfield, argued the cause for appellant. With him on the briefs was Thorp, Dennett, Purdy, Golden & Jewett, Springfield.

Steve C. Baldwin, Eugene, argued the cause for respondent. With him on the brief was Harrang, Long, Watkinson, Arnold & Laird, Eugene.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

RIGGS, J.

## RIGGS, J.

This is an appeal from an order of the probate court refusing to grant appellant's motion to remove respondent as personal representative of his mother's estate and as trustee for *inter vivos* and testamentary trusts established by his mother on behalf of his niece. Appellant's motion was based on allegations of self-dealing and conflict of interest. We review *de novo*, ORS 128.165, ORS 19.010(4), and agree with the probate court that the evidence does not justify removal of the personal representative. We begin our analysis with a summary of the complicated facts.

In September, 1985, Maurice Holst (Maurice) died, leaving his estate to his wife Anna Holst (Anna) and two sons, Leland Holst (Leland) and Carson Holst (Carson). On October 21, 1987, Anna, Carson and a third person not connected with this case died in a plane crash. Carson was the pilot. A fourth passenger in the plane, Carson's 3-year-old daughter, Aubrey, survived. Several months before her death, Anna had established an *inter vivos* trust, naming Leland as trustee and Aubrey as beneficiary. That trust was funded by 1,600 one-ounce pieces of silver. Anna's will devised her personal effects to her surviving children (Leland is the only surviving child of Anna) and devised the residue of her estate in equal shares to Leland outright, and in trust for Aubrey. Anna also had an IRA worth approximately $300,000. It was unclear at the time of Anna's death and for sometime afterwards whether Leland was the sole beneficiary of the IRA, whether Carson's estate and Leland were to share the IRA or whether the IRA was part of Anna's estate.[1]

Aubrey's mother, Sherene Clifford (Sherene), lived with Carson before, and for a year or so after, Aubrey's birth,

---

[1] The effect of the last two possibilities would not be the same. If the IRA were to be divided between Leland and Carson's estate, Aubrey would be entitled to a direct distribution of one-half of the IRA as Carson's sole heir. If the IRA is part of Anna's estate, then Aubrey would be entitled to one-half of it, but it would be placed into the testamentary trust established for Aubrey by Anna's will. Aubrey would not be entitled to a direct distribution, and Leland, as trustee, would be in control of distributions according to the terms of the trust.

but she never married Carson.[2] The uncontradicted testimony in the record is that Sherene left Aubrey in Carson's custody when Aubrey was 1-1/2 or 2 years old. She had virtually no contact with Aubrey until a few days after the plane crash when she arrived at the hospital, asserted her right to custody of Aubrey and prevented Leland from seeing her in the hospital.[3]

Leland filed a wrongful death action against Carson's estate on behalf of Anna's estate, and Sherene filed a personal injury action against Carson's estate on behalf of Aubrey. Leland, concerned that Sherene wanted to use Aubrey to get as much money as she could out of the various Holst estates, offered to drop his action against Carson's estate if he were named as Aubrey's conservator.[4] The settlement offer was rejected[5] and, several months later, Sherene petitioned the probate court to appoint a third party as Aubrey's conservator. The court appointed Dwight Purdy (Purdy), the appellant in this case.

In December 1989, Leland petitioned the probate court for instructions as to the proper classification and disposition of Anna's IRA. Purdy then petitioned the court to remove Leland as personal representative of Anna's estate, alleging that Leland was unfaithful and neglectful of the trust, had a conflict of interest and had breached his fiduciary duties to the estate. Purdy also petitioned that Leland be removed as trustee of the two trusts established for Aubrey's benefit, alleging that Leland had a conflict of interest, divided loyalties, inability to administer the trust and animosity toward the beneficiary. The probate court found that

---

[2] Aubrey's parentage is not in dispute. Sherene is her biological mother, and Carson was her biological father.

[3] Leland, as the only surviving family member available, signed the consent forms for Aubrey's emergency treatment after the accident. Leland testified that he fully expected to take Aubrey home when she was released from the hospital and was "shocked" when he was not allowed to see her.

[4] Leland's offer was that he was

"prepared to dismiss the wrongful death claim, other than that which is covered by insurance, if it were stipulated by all parties that he be named conservator of the funds which will be due Aubrey by way of the estate of Carson Holst."

[5] The record indicates that both lawsuits against Carson's estate were settled. Anna's estate received $12,500, and Aubrey received approximately $15,000.

Leland's actions were loyal to Anna's desires and that there was nothing to justify his removal. Purdy appeals.

■■ If Purdy's allegations are true, respondent *may* be removed as personal representative and trustee. ORS 113.195(2).[6] There is a strong statutory and common law preference to defer to the designation of a personal representative made by the testator. ORS 113.085; *In re Workman's Estate*, 151 Or 475, 478, 49 P2d 1136 (1935). The decision whether to remove a personal representative is a matter of discretion for the court, but we review *de novo*. ORS 128.165; ORS 19.010(4). The removal of a personal representative or trustee must be decided on the particular facts of the case. *In re Elder's Estate*, 160 Or 111, 83 P2d 477 (1938).

■ As a preliminary matter, we address Leland's argument that we do not have jurisdiction to hear this appeal. Leland relies on a Supreme Court case that was decided after our ruling on his motion to dismiss, which we denied.

Leland's reliance on *Roe v. Pierce*, 313 Or 228, 832 P2d 1226 (1992), is misplaced. In that case the Supreme Court vacated an order of this court for lack of jurisdiction and remanded with instructions to dismiss the appeal. The appeal was from a probate court order approving and distributing a settlement of a personal injury claim brought by the decedent while he was still living and a subsequent wrongful death claim brought by his spouse. The appellants were the children of the deceased by a previous marriage, and they objected to the distribution of the settlement approved by the probate court. The appellants argued that appellate jurisdiction was based on ORS 30.060. As a prerequisite to jurisdiction under that statute, there must be an order of distribution or apportionment under ORS 30.040 or ORS 30.050. Those statutes deal with apportionments of proceeds for pecuniary loss and loss of society.

The court found that the appellants did not challenge the part of the distribution apportioning proceeds to the decedent's spouse for loss of society, companionship and services. Nor did they challenge the distribution on the basis

---

[6] ORS 113.195(2) provides:

"When a personal representative has been unfaithful to or neglectful of the trust, the court may remove the personal representative."

that they were entitled to receive a portion of the settlement for those types of losses. Therefore, there was no jurisdiction under ORS 30.060, because the appellants did not challenge the distribution on the appropriate grounds.

In this case, Purdy appeals from an order based on his action as conservator for the beneficiary of the estate and trusts for which Leland is responsible. That action falls squarely within ORS 128.135, and appellate jurisdiction is appropriate under ORS 128.165 and ORS 19.010(4). *Roe v. Pierce, supra*, does not require a different result.

■ We now consider the merits of the appeal. There are several factual issues that raise inferences about Leland's character and ability to carry out his duties in an impartial manner and free of impropriety. However, of those, only two merit discussion: Leland's handling of Anna's IRA and the wrongful death action he filed against Carson's estate on behalf of Anna's estate.

Some time before 1986, Anna established an IRA with the Delaware Charter Guarantee & Trust Company (Guarantee & Trust). Leland and Carson were designated the beneficiaries of that account. In September 1986, Anna transferred the account to Dain Bosworth Trust Company (Dain Bosworth), apparently so she could continue to work with her accountant, who had moved to Dain Bosworth. After Anna's death, Leland listed the IRA as an asset of her estate. He then received a letter from Dain Bosworth saying that they would honor the designation of beneficiaries that Anna had made at Guarantee & Trust, but that it was unclear how to handle the half of the IRA that would have gone to Carson had he survived his mother. Believing that the distribution of the IRA was controlled by Anna's designation of beneficiaries, Leland removed it from the inventory of assets of her estate. The IRA was listed in the first annual accounting filed by Leland but was listed as passing outside Anna's estate. There were no objections filed to Leland's handling of the IRA at that point.

Shortly after Leland filed the first annual accounting, he received a second letter from Dain Bosworth restating that it believed the IRA passed outside Anna's estate, but indicating that her prior designation of beneficiaries did not

clarify how the IRA should be distributed, because it did not address survivorship, and Anna and Carson's simultaneous deaths made it unclear how the account was to be distributed. Dain Bosworth strongly urged Leland to arrive at an agreement on the distribution of the IRA with any other interested parties and to provide Dain Bosworth with a legal document memorializing that agreement upon which it could act.

Leland took no immediate action except to follow the advice of his accountant. He was advised that he could best preserve the value of the IRA and minimize the tax consequences if the funds were withdrawn over a five-year period. Leland still had reason to believe that the IRA passed outside Anna's estate and that he was entitled to at least half of it. Based on that reasonable belief and the advice of his accountant, he made one withdrawal of $40,000 and transferred it to his own account. All evidence in the record indicates that that money is still in the account. There were still no objections filed to the handling of the IRA, and Leland took no further action because other matters concerning the various Holst estates intervened.[7]

In October, 1989, Leland found a completed but undated Dain Bosworth designation of beneficiary form, with a facsimile of Anna's signature. Whether the form was authentic, a copy or an undelivered original, it raised questions concerning whether Anna had made an effective designation of beneficiaries with Dain Bosworth and whether the IRA should pass in or outside her estate. It was at that time that Leland petitioned the probate court for instructions concerning the IRA.

Given the first representations made by Dain Bosworth that it would honor the designation of beneficiaries that Anna had made at Guarantee & Trust, it does not appear that Leland was acting in bad faith, violating any fiduciary duty to the estate or acting with a conflict of interest when he removed the IRA from the inventory of estate assets. In his petition for instructions, he took no position on how the IRA should be designated. He testified that he did not want to take

---

[7] One of the most important intervening matters was a lawsuit by Purdy attempting to have Aubrey designated as an heir or legatee of Maurice's estate. A court ruling clarified that Maurice's will made Leland the sole heir of that estate.

a position either way, because that could create a conflict of interest that would interfere with his ability to act as personal representative of Anna's estate. We agree with the probate court that Leland's conduct regarding Anna's IRA was not inappropriate in light of the information and advice he received. It does not justify his removal as personal representative of his mother's estate.

■ Purdy's petition that Leland be removed as trustee of the two trusts established for Aubrey's benefit is based on the wrongful death action Leland filed against Carson's estate and Purdy's allegations that Leland is hostile toward the beneficiary of the trusts. Purdy argues that the wrongful death action is only one of several attempts by Leland to deplete Carson's estate to Aubrey's detriment and that those actions indicate his hostility toward her and therefore are grounds for his removal. Apparently, Purdy believes that any hostility by a trustee toward a beneficiary is grounds for removal.

The record indicates that the wrongful death action on behalf of Anna's estate was well founded in the law. Although the details of the plane crash are not in the record of this case, there was testimony that Carson was negligent in his piloting of the aircraft. There was also evidence that the estate of the third person who was killed in that crash collected a substantial sum from Carson's estate on a comparable wrongful death claim.

That the suit filed by Leland on behalf of Anna's estate had the potential of reducing the amount that Aubrey would inherit as the sole heir of Carson's estate is irrelevant. That Aubrey has an interest in both Carson and Anna's estates does not mean that Leland's actions against the former on behalf of the latter were inappropriate or constitute a breach of his duties to Aubrey. Leland, as the personal representative of Anna's estate, is duty-bound to "preserve, settle and distribute the estate." ORS 114.265. That includes a statutory authorization, and perhaps a duty, to pursue personal injury and wrongful death actions on behalf of the decedent. ORS 114.305(20). The filing of the action does not, in itself, indicate a conflict of interest or hostility toward Aubrey. However, Leland's motives for filing the wrongful

death action and his other steps to deplete Carson's estate give us pause and merit discussion.

■      Leland has made no effort to conceal his animosity toward Sherene. Although she is not the beneficiary of any estate or trust for which Leland is responsible, and he owes her no duty, such animosity may interfere with his administration of the trusts on behalf of Aubrey. Leland freely admits that he did endeavor to deplete Carson's estate, but only because he believed that whatever passed to Aubrey through that estate would be under Sherene's control and would not go to Aubrey's benefit, but to Sherene's. According to Leland, that is why he offered to drop the wrongful death action in exchange for being named Aubrey's conservator. He reasoned that, as her conservator, he could control and manage his brother's estate for Aubrey's benefit and prevent Sherene from misusing or misdirecting those funds. The record indicates that Anna shared Leland's dislike and distrust of Sherene and that those feelings were not unfounded.[8] There is evidence that Anna established the two trusts to provide for Aubrey and also to ensure that Sherene would not have access to any of the funds. Given that background and Sherene's virtual abandonment of Aubrey for 1 to 1-1/2 years, we conclude that Leland's concerns are not unfounded and that his actions are not inconsistent with his duties to Aubrey. On this record, we agree with the probate court that Leland has not committed any act that justifies his removal as trustee. However, the intense feelings between Leland and Sherene warrant a precautionary measure. We remand the case to the probate court for imposition of a bond requirement on Leland as trustee of the two trusts.

Remanded with instructions to impose bond requirement on respondent as trustee; otherwise affirmed.

---

[8] Rather than recount all of the evidence in the record, we note only two items: When Anna established the *inter vivos* trust for Aubrey's benefit, she gave specific instructions that Sherene was not to be given any information concerning how the trust was funded or the terms of the trust. Also, both Leland and Purdy expressed concern about how Sherene had spent the money awarded on Aubrey's behalf in the settlement of her personal injury action against Carson's estate. By the time Purdy was appointed as Aubrey's conservator, that action had already been settled and, apparently, the money was already gone. For Leland, that information only confirmed his belief that Sherene was using Aubrey to get as much money as she could from the various Holst estates. At trial, Purdy testified that he was unsure of how the money was spent and had thus far been unable to get an accounting for it from Sherene.